Mark D. Pfeiffer, Judge
Via judicial construct, the majority opinion today engrafts the exclusionary rule remedy upon section 211.059 — which otherwise identifies no such remedy -in this *706 Missouri juvenile Miranda statute — without heeding the caution of the United States Supreme Court that courts must “maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it.” United States v. Patane, 542 U.S. 630, 643, 124 S.Ct. 2620,159 L.Ed.2d 667 (2004). In so doing, the.majority opinion ignores decades of jurisprudence on the topic of the purpose of the exclusionary rule and goes where no court in this country has gone on the topic of applying the exclusionary rule as a remedy to a juvenile’s right against self-incrimination — whether ' by constitutional or statutory accord — when weighed against exigent circumstances emergently impacting the public’s right to safety. Accordingly, I respectfully dissent.
I disagree with the majority opinion’s suggestion that this case presents an issue of first impression relating to the scope of a juvenile’s right against self-incrimination in the State of Missouri; rather, I believe this case requires us to evaluate the issue of what remedy may or may not be available to Missouri juveniles in circumstances such as those with which we are presented today. More specifically, the issue., presented .by this case is whether an unwarned statement, made by a juvenile in custody, in response to a . limited question asked for the purpose of preserving public safety in the face of exigent circumstances, warrants suppression under either Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or section 211.059.[1] I belieye it does not.
The Origin and Nature of Miranda
■ In Miranda, the United States Supreme Court “extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police.” New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). “The Miranda Court ... presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights.” Id. (footnote omitted). Accordingly, the Miranda decision created both a protection for the accused relating to Fifth Amendment rights (presumption of coercion) and a remedy (suppression of unwarned statements). Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (“Failure to administer Miranda warnings creates a presumption of- compulsion. Consequently, unwarned statements that áre otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda.”)-, see also Patane, 542 U.S. at 639, 124 S.Ct. 2620 (noting that the Miranda presumption is “generally irrebutta-ble for purposes of the prosecution’s case in chief’).
“The prophylactic Miranda warnings!, however,] .... are ‘not themselves rights protected by the Constitution but [are] instead measures to [e]nsure that the right against compulsory self-incrimination [is] protected.-’ ” Quarles, 467 U.S. at 654, 104 *707 S.Ct. 2626 (quoting Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). Accordingly, “a simple failure to administer Miranda warnings is not in itself a violation of the Fifth Amendment.” Elstad, 470 U.S. at 307 n. 1, 105 S.Ct. Í285. Instead, it merely “affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements.” Id.
The Fifth Amendment contains its own exclusionary rule, in a sense, by precluding the use of compelled testimony: “No person .shall be compelled in any criminal case to be a witness against himself....” U.S. Const, amend. V. “The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself.” Elstad, 470 U.S. at 306, 105 S.Ct. 1285 (emphasis added). .
The Impact of Quarles upon Miranda Warnings
In Quarles, a woman approached two police officers who were on road patrol, reported that she had just been raped, described her assailant, and told the officers that the man had just entered a nearby supermarket and was carrying a gun. 467 U.S. at 649, 104 S.Ct. 2626, After apprehending the suspect, one of the officers frisked the suspect and discovered that he was wearing an empty shoulder holster; thus, after handcuffing him, the officer asked the suspect where the gun was. Id. The suspect complied and the gun was recovered. Id. During-the criminal prosecution, the defendant sought to have his incriminating statement to law enforcement about the gun suppressed since he had made the statement prior to receiving Miranda warnings. Id. The Quarles court proceeded to declare a “public safety” exception to the mandate of Miranda, noting:
The police in this case, in the very act of apprehending a suspect, were confront ed with the immediate necessity of ascertaining the -whereabouts - of a gun which, they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual. whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.
In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles’ position might well be deterred from responding. Procedural safeguards, which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost. Here, had 'Miranda warnings deterred Quarles from responding to [the Officer’s] question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. [The Officer] needed an answer to his question not simply to make his case against Quarles but to [ejnsure that further danger to the public did not result from the concealment of the gun in a public area. ■ ■
We conclude that the need for answers to questions in .a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege against self-incrimination. We decline to place police officers such as-[the arresting officer] in the untenable position of hav *708 ing' to consider, often in a matter of seconds, whether-it best, serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to ' give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy •their ability to obtain that evidence and neutralize the volatile situation confronting them.
Id. at 657-58, 104 S.Ct. 2626 (emphasis added).[2] Subsequently, in Dickerson' v. United States, the Supreme Court noted that modifications to Miranda, such as Quarles, “are as much a normal part of constitutional law as the original decision.” 530 U.S. 428, 441, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). And, while the specific issue addressed by the Quarles Court was the scope of the Miranda protection (“[T]he only issue before 'us is whether [the officer] was justified in fading to make available to respondent the procedural safeguards associated with the privilege against compulsory self-incrimination since Miranda.”), Quarles, Mil U.S. at 654-55, 104 S.Ct., 2626 (footnote omitted), as the foregoing lengthy quotation denotes, the Supreme Court couched part of its analysis in Quarles by weighing the competing interests of a remedy (suppression of evidence) leading to “fewer convictions” versus the necessity to “ensure that further danger to the public did not-result from the concealment of the gun ■ in a public area.” '
Irrespective of the evaluation of J.L.EL’s federal constitutional ‘.‘rights” or “protections” versus any corresponding “remedy,” it is evident that the decision in Quarles precludes J.L.H.’s claim that suppression is warranted under Miranda. Though J.L.H. was not given his Miranda warnings, despite being in custody when asked about the gun, the officers had every reason to believe that J.L.H. had recently discarded the weapon in a very public location with many children present; thus, the weapon posed an exigent threat to public safety. And that concern was “paramount to adherence, to the literal language of the prophylactic rules enunciated in Miranda.” Id. at 653, 104 S.Ct. 2626. Thus, the protection afforded by Miranda was not required.
The Effect of Section 211.059
Although suppression was not warranted under Miranda, “[pjrocedures which would yield, a constitutional , confession from adults may not if the suspect is a juvenile.” State v. Jones, 699 S.W.2d 525, 527 (Mo.App.E.D.1985) (citing Haley v. Ohio, 332 U.S, 596, 68, S.Ct. 302, 92 L.Ed. 224 (1948)). In Missouri, section 211.059 speaks directly to the procedures required when juveniles are taken into custody.
*709 When a child is taken into custody by a juvenile officer or law enforcement , official, with or without a warrant for an offense in violation of the juvenile code or the general law which would place the child under the jurisdiction of the juvenile court 'pursuant to subdivision (2) or (3) of subsection 1 of section 211.031, the child shall be advised prior to questioning:
(1) That he has the right to remain silent; and
(2) That any statement he does make to anyone can be and may be used against him; and
(3) That he has a right to have a parent, guardian or custodian present during questioning; and
(4) That he has a right to consult with an attorney and that one will be appointed and paid for him if he cannot afford one.
§ 211.059.1. Though the statute largely reflects the same warnings'required by the Miranda; decision,- it is- plainly broader than the Miranda decision insofar as it also requires a warning that the juvenile “has a right to have a parent, guardian or custodian present during questioning.” Id, Certainly, “states are free to provide greater protections in their criminal justice system than the Federal constitution requires.”- State v. Whitfield, 107 S.W.3d 253, 267 (Mo. banc 2003) (internal quotation omitted). - Irrespective, the statute is independent of the Miranda decision, State v. Burris, 32 S.W.3d. 583, 589 (Mo. App.S.D.2000); thus, it must be analyzed independently.
Like Miranda, the mandatory warnings to Missouri juveniles in section 211.059 are absolute. Like Miranda, then, one might also reasonably assume that no such right or protection is, however, “immutable.” Dickerson, 530 U.S. at 441,. 120 S.Ct. 2326.[3] Accordingly,. I respectfully disagree with the majority opinion that the protection afforded juveniles in section 211.059 is without regard to any limitation *710 whatsoever, even where exigent circumstances affecting the public safety and welfare are present. This court has previously noted as much in State v. Tolliver, 561 S.W.2d 407 (Mo. App.1977). In Tol-liver, even when affirming the suppression of a juvenile’s statement as taken in violation of section 211.059, the court contemplated some sort of exigent or emergency circumstances as an exception to the requirements of section 211.059, stating: “In considering this whole situation, it is important to note that there was nothing of an exigent nature.... If there had existed an emergency situation, much could be excused.” Id. at 410 (emphasis added).[4] Not so coincidentally, the majority and concurring opinions ignore Tolliver.
That said, for the sake of argument, I am willing to proceed from the majority opinion’s declaration that J.L.H.’s rights under section 211.059 were violated. I do so to point out that which has-been ignored by the majority opinion: the judge-made remedy that the majority has engrafted upon section 211.059 (exclusionary rule) is, itself, subject to rules limiting its application — and when those rules are applied to the present situation, the exclusionary rule is clearly not appropriate here.[5]
Exclusionary Rule Suppression of Evidence)
Though section 211.059 is independent of the Miranda decision, like Miranda, it is obviously a prophylactic rule, designed as a means of protecting a juvenile’s right against compelled self-incrimination. And like Miranda, it reaches further than the constitutional right by providing greater protection for the accused. But the fact remains that the statute is independent of Miranda and section 211.059 provides no remedy within its statutory framework.[6] *711 J.L.H. sought suppression of his statement as a remedy. Accordingly, the real question of this case is whether the judicially created exclusionary rule should be - applied in the circumstances of this case.
In large part, this is the point of divergence between the majonty and concurring opinions and my dissent. The majority and concurring opinions ignore that the only “writing in to the statute” in this case occurs when the majority, and concurring opinions “write in” a remedy to a statute that contains none. And in so doing, the majority and concurring opinions choose to “write in” the remedy of the exclusionary rule but-believe it is a sound principle of jurisprudence to ignore United States Supreme Court precedent on the topic of when and how the exclusionary rule should be applied as a judicially crafted remedy in any situation — statutory, constitutional rule, international treaty, or otherwise— even though the United States Supreme Court judicially crafted the remedy in the first place. I respectfully submit that this is an alarmingly dangerous precedent and one that I cannot support. Instead, I believe we must evaluate the precedent from the United States Supreme Court instructing us on how and when we may use the remedy of suppression and apply that precedent to the factual and procedural circumstances of this case, to-wit:
Like the Fifth Amendment, section 211.059 “says nothing about suppressing evidence obtained in violation of [its] command.” Davis v. United States, 564 U.S. 229, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011).[7] “The question of whether the exclusionary rule’s remedy is appropriate in a particular context has long been regarded as an issue separate from the question of whether the ... rights of the party seeking to invoke the rule were violated by police conduct.” Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
Here, we are dealing with a statutory violation, rather than a constitutional one. But that does not preclude the use of the exclusionary rule, nor any accompanying discussion about what circumstances justify its use as a remedy. The United States Supreme Court has applied the exclusionary rule as a remedy for. violation of a statute where the statute at issue implicated important Fifth Amendment interests. See Miranda, 384 U.S. at 463, 86 S.Ct. 1602 (citing McNabb v. United States, 318 U.S. 332, 343, 63 S.Ct. 608, 87 L.Ed. 819 (1943)). But whether the exclusionary rule applies to statutory protections — like any other instance in which an unwarned self-incriminatory statement has been obtained by law enforcement — is governed *712 largely by whether the purposes of the exclusionary rule would be served if applied to the statutory violation. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 349-50, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006) (refusing to apply the exclusionary rule for officers’ violation of Article 36 of the Vienna Convention, ie„ not advising: the suspect before questioning of his right to consular notification). Accordingly, one must discern whether the purposes of the exclusionary rule would be served by applying it to statements obtained from juveniles in violation of section 211.059 but for the purpose of protecting the public in exigent circumstances threatening public safety.
The exclusionary rule “serves two distinct purposes: preserving the integrity of the judicial system and déterring official misconduct.” Michael H. Pryor, The Exclusionary Rule, 75 Geo. L.J. 845, 846 (1987). See also Michigan v. Tucker, 417 U.S. 433, 447-49, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). The United States Supreme Court has cautioned that courts must “maintain the closest possible fit between the Self-Incrimination Clause and any judge-made rule designed to protect it.”
Patane, 542' U.S. at 643, 124 S.Ct. 2620.[8] Thus, if suppression of evidence obtained in violation of section 211.059 fails to serve the dual aims of the exclusionary rule (ie.,-the assurance of reliable evidence and deterrence of official misconduct), it does not meet the close-fit requirement and should not be applied.

Assurance of Reliable Evidence

When “the right against compulsory self-incrimination [is] involved, [one of two] justification[s] for the exclusionary rule ... [is] protection of the courts from reliance on untrustworthy evidence.” Tucker, 417 U.S. at 448, 94 S.Ct. 2357 (footnote omitted). Examples of compulsory self-incrimination “must, by definition, involve an element of coercion ... often depicting] severe pressures which may override a particular suspect’s insistence on innocence.” Id. “Fact situations ranging from classical third-degree torture, to prolonged isolation from family or friends in a hostile setting, or to a simple desire on the part of a physically- or mentally exhausted suspect to have a seemingly endless interrogation end, all might be sufficient to cause a defendant to accuse himself.false *713 ly.” Id. at 448-49, 94 S.Ct. 2357 (citations omitted).
While the prophylaxis of section 211.059, like Miranda, is designed to ensure that any incriminating statements given by a juvenile are not coerced (and thereby may be relied upon), the situations of coercion described in Tucker are a far cry from those presented here. Here, immediately after his unsuccessful flight from law enforcement on foot and after unwarned questioning posed to him only about the location of the weapon he had presumedly tossed in the path of his attempted escape, J.L.H. promptly told Sergeant Williams where he had tossed the gun.
As the Court in Elstad recognized, “[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced.” Elstad, 470 U.S. at 310, 105 S.Ct. 1285. The same can be said of statements obtained upon a failure to warn in compliance with section 211.059. See, e.g., State v. Barnaby, 950 S.W.2d 1, 3 (Mo. App.W.D.1997) (holding that the absence of a parent at a juvenile’s interrogation does not “make[] a resulting statement illegal per se”).
The simple fact that J.L.H. had not been warned in accordance with section 211.059 does not render his statement unreliable. In fact, the record demonstrates the contrary. “[T]he reliability of a single item of evidence often depends on other evidence, rather than being assessable in isolation.” Samuel v. Frank, 525 F.3d 566, 570-71 (7th Cir.2008). “[Reliability - may be , established in corroboration, as when a... statement reveals a fact, say the location of the murder victim’s body, that only the murderer could have known.” Id. Here, J.L.H.’s statement was plainly reliable, as the loaded gun was discovered in the. exact location where he indicated it would be and, not so coincidentally, in the path of his attempted escape from law enforcement officers who had been chasing him only minutes earlier. Accordingly, the purpose of excluding unreliable evidence would not be served in this context.

Deterrence of Official Misconduct

The second rationale for applying the exclusionary rule is deterrence of official misconduct. Tucker, 417 U.S. at 447, 94 S.Ct. 2357. But here, it is not clear that officers engaged in any intentional misconduct or that such misconduct would' be deterred by application of the exclusionary rule in this context.
To begin, though the parties argue over whether Officer Hill knew that J.L.H. was a juvenile, the real issue is whether Sergeant Williams — the officer who asked J.L.H. where the gun was — knew that J.L.H. was a juvenile. Quite simply, there is nothing in the record indicating that Sergeant Williams knew that J.L.H. was a juvenile. And in the absence of J.L.H.’s juvenile- status, Sergeant Williams was clearly justified under Quarles in asking J.L.H. about the whereabouts of the gun. See Berkemer v. McCarty, 468 U.S. 420, 431, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that “[i]t would be unreasonable to expect the police to. make guesses as to the nature of the criminal conduct at issue before deciding how they may interrogate a suspect.”); Davis, 131 S.Ct. at 2429 (“[W]hen binding appellate precedent: specifically authorizes a particular, police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.... The deterrent effect of exclusion in such a case can only be to discourage the officer from ‘do[ing] his duty.’ ”).
Requiring exclusion of evidence in this context would force officers confronting similar situations, first to verify whether the suspect is a juvenile or adult, and doing so would hamper the public safety *714 rationale for the questioning (of the location of the dangerous weapon) in the first place. The entire justification for bypassing the Miranda warnings in Quarles was the exigency of the circumstances and the need to .protect the public’s safety. Forcing officers to take additional time to verify whether a suspect is a juvenile before asking the limited public safety question only exacerbates the exigency of the situation.[9] Thus, the only thing to be deterred would be an officer’s swift response to protect the public at large-that is, “dis-courag[ing] the officer from ‘do[ing] his duty.’” Id. Accordingly, the deterrence rationale does not support exclusion.'

Supression Serves Neither J.L.H.’s Welfare Nor the State’s Best Interest

Another aspect of this case that the majority and concurring opinions have ignored is that the present proceeding is not a criminal proceeding; rather, the present proceeding is a civil juvenile delinquency proceeding. The State of Missouri is not seeking to confine J.L.H. in a state penitentiary; instead, the State is attempting to treat and rehabilitate a troubled youth before the “sins of his youth” permanently scar the hope for his future. ■ This, I believe, is a distinction with a difference and bears relevance on the discussion of the topic of what remedy best serves both J.L.H.’s welfare and the State’s interest in guiding J.L.H. away from a life that may lead to a criminal court.
Herein lies another problem I find with the majority and concurring opinions relying so heavily upon State v. Wade, 531 S.W.2d 726, 729 (Mo. banc 1976), and State v. Arbeiter, 408 S.W.2d 26, 29-31 (Mo. 1966). Reliance upon those cases overlooks a vital distinguishing factor: both Wade and Arbeiter were criminal prosecutions, and not civil juvenile delinquency proceedings.
This distinction is important because it changes the perspective and purpose of both the juvenile and the court. In Wade . and Arbeiter, the juveniles were not in the position of delinquent children; instead, they stood before the court as criminal defendants, subject to punishment through incarceration. Though minors when they committed their crimes, Wade and Arbeiter were adults in' the eyes of the law, and the court’s duty was to ensure a just sentence for their crimes. In J.L.H., however, the juvenile stood before the juvenile court as a misguided youth in need of treatment and rehabilitation, and the juvenile court’s duty was to help reform the child and guide him back to a law-abiding course of life so that he did not end up being another criminal defendant.
“The purpose of ... chapter [211] is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court. This chapter shall be liberally construed, therefore, to the end that each child coming within the jurisdiction of the juvenile court shall re-óeive such care, guidance and control as will conduce to the child’s welfare and the best interests of the state_” § 211.011 (emphasis added). According to the statute, there are two interests at play in juvenile cases: the child’s welfare and the best interests of the state. In light of those interests, it is difficult to see how suppression of J.L.H.’s response to a question posed solely to protect the safety of the public is an appropriate response inso *715 far as suppression fails to serve either interest identified. .
As I have pointed out previously, section 211.059' provides no remedy for a violation of its mandates. Though suppression has been sought and applied in juvenile cases, both ease law and the Juvenile Code itself recognize that suppression may not serve the juvenile’s welfare insofar as suppression of statements, generally, in the juvenile case runs, counter to the rehabilitative purposes of the Juvenile Code. ■
Section 211.271.3 provides that, “[a]fter a child is taken into custody ... all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel ... are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter(emphasis added). “[T]he underlying policy and purpose of § 211.271(3) is to allow a juvenile to discuss his problems with the juvenile officer in a relaxed, non-adversary, confidential setting freely, openly- and without fear in order that the juvenile officer and juvenile court personnel may attempt to aid the youth in his rehabilitation.” State v. Ross, 516 S,.W.2d 311, 320 (Mo.App.1974). “If the purpose and underlying policy of the statute is to be meaningful, and a youth is to be encouraged to discuss his problems freely so that juvenile court personnel may be in a better position to aid the juvenile, we believe that not only the statement made to the juvenile officer, but also physical evidence obtained thereby, such as the gun here, which is . not otherwise discoverable from an independent source should also be inadmissible except in the juvenile court system.” Id.
Though suppression was an appropriate remedy in both Wade and Arbeiter, those cases were criminal, not juvenile, cases. Conversely, because we want to encourage open communication in juvenile cases in order to facilitate the juvenile’s rehabilitation’, applying the suppression remedy in a juvenile case such as this one makes little sense. '
“The purpose,of the Juvenile Act is not to convict of criminal offenses but is to safeguard and reform erring children....” In re C, 314 S.W.2d 756, 760 (Mo.App.1958) (emphasis, added). “A delinquency hearing, therefore, is not a ‘criminal case,’ as it does not charge the juvenile with the commission of a crime, even though the conduct alleged against him may be the violation of a criminal law.” State ex rel. R.L.W. v. Billings, 451 S.W.2d 125, 127 (Mo. banc 1970). “It is but the assertion of the state’s power, parens patriae, for the reformation of a child and not for his punishment under the criminal law.” Id. “[F]rom the moment a child commits an offense, in. effect he is exempt from the criminal law unless and until the Juvenile Court waives its jurisdiction.” Harling v. United States, 295 F.2d 161, 163 (D.C.Cir. 1961) (footnotes omitted).[10] And “[i]t is .•.. because children are, generally speak- *716 mg, exempt from criminal- penalties that safeguards of the criminal law, such as ... the exclusionary ... rule; have no general application in juvenile proceedings.” Id. (emphasis added).
In addition to the welfare of thd juvenile, the. Juvenile Code is also designed to consider the best interests < of, the ; State.. “[T]he state, as pareps patriae, — the community-society, — has an interest ... to protect the public from possible injury. ...” State ex rel. Wilkerson v. Skinker, 344 Mo. 359, 126 S.W.2d 1156, 1161 (Mo. 1939). Clearly, it is in the public’s best interest that law enforcement officers be permitted to ask public safety questions without risking suppression. The rationale in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), was that “concern for public safety must be paramount to' adherence to the literal language of the prophylactic rules enunciated in Miranda”' Id. at 653, 104 S.Ct. 2626. Accordingly, the suppression of J.L.H.’s statement in response to the public safety question also fails to protect the best interests of the State.
In short, even if Wade and Arbeiter may be read to require suppression as the remedy for violations of the Juvenile Code, that remedy was in 'the ■ context of subsequent criminal prosecutions, not civil juvenile delinquency adjudications. Arid even then; neither case accounted for the exact scenario present in this case — where the unwarned statement was made" in response to a public safety question involving exigent circumstances. Arbeiter specifically left other scenarios open: “We are, of course, determining only the question here presented. We do .not consider .the question of spontaneous statements by a juvenile prior to being taken before the juvenile judgé or juvenile officer; nor do we consider ’ statements of a juvenile in response to questioning after § 211.061 has been complied with.” Arbeiter, 408 S.W.2d at 31. Thus, neither Wade nor Arbeiter mandate suppression in this case.
Conclusion qs to Applicability of the Exclusionary Rule
In short, neither purpose of the exclusionary rule would be served by its judge-made remedial application in the context of the purported violation of J.L.H.’s section 211.059 rights. Likewise, neither purpose of the Juvenile Code would be served by suppressing J.L.H.’s statement to law enforcement about the location of a gun that posed an exigent threat to the public’s safety. The only purpose sérved by applying the exclusionary rule here would be to say that, though' the need for answers to questions in a situation posing an exigent threat to the public safety outweighs thé need for the prophylactic rule protecting the Fifth Amendment’s privilegé against self-incrimiriation for adults in a criminal court context, it does not outweigh derivative statutory requirements (ie., § 211.059) in the context of a Juvenile Code designed to openly address the troubles of youth in a civil juvenile delinquency proceeding. The result is to elevate a procedural protection for a delinquent juvenile — who is riot subject to criminal penalties — over the safety of the general public, which here included many innocent children and adults. Such a result ignores the purpose of the Juvenile Code, ignores the purpose of the exclusionary rule, and is fraught with dangerous practical ramifications to law enforcement performing its duty in exigent circumstances affecting the public’s safety. Accordingly, I do not believe the exclusionary rule should be applied as a judge-made remedy — under section 211.059 — for J.L.H. in this case.[11] *717 See Sanchez-Llamds, 548 U.S. at 349, 126 S.Ct. 2669 (“[T]he reasons we often require suppression for Fourth and Fifth Amendment violations are entirely absent [in this case].”).
Conclusion
I would affirm the juvenile court’s ruling denying J.L.H.’s motion to suppress and would affirm the juvenile court’s adjudication and disposition ruling.[12]'

. Both the majority and concurring opinions repeatedly recite the anthem that "this case involves the interpretation and application of a state statute, not the constitutional principles developed in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.id 694 (1966).” Clearly, such a suggestion is erroneous as juveniles in Missouri are entitled to both a statutory right under section 211.059 and a Fifth Amendment federal constitutional right; hence, the reason my dissenting opinion addresses both of these rights. What the majority and concurring opinions fail to recognize is that the real question on appeal is the applicability of the judicially created remedy at issue.

. In the yéars since Quarles was decided, courts have broadened the exception's application, in the context of an in-custody adult, without regard to the immediacy of the purported public safety threat, and overwhelmingly apply the exception when the question asked pertains to the location of a fíreárm’ or whether the weapon is loaded. Joanna Wright, Comment, Mirandizing Terrorists? An Empirical Analysis of the Public Safety Exception, 111 Colúm. L, Rev. 1296, 1325 (2011) • (observing, based on- a study of state and federal cases citing Quarles, from 1984 to 2010, that the courts admit un-Mirandized statements relating to these questions some 80 percent of the time). See also Alan Raphael, The Current Scope of the Public Safety Exception to Miranda Under New York v. Quarles, 2 N.Y. City L. Rev. 63, 70-71, 81 (1998) (concluding that a series of cases expanded the exception and thus, "it is always reasonable for police to inquire as to the location of weapons,” "regardless of whether there exists an objective reason to believe that • the particular - suspect possessed or' used same.”).

. For example, “[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.... The question in every case is whether the words used are- used in such circumstances and are of such a nature as to create a clear and present danger-” Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). ‘‘[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views whenever and however and wherever they please." Wood v. Moss, — U.S. —, 134 S.Ct. 2056, 2066, 188 L.Ed.2d . 1039 (2014) (internal .quotation omitted). "Like most rights, the right secured by the Second Amendment is not unlimited.” District of Columbia v. Heller, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (holding that the right to bear arms "is not unlimit,ed” and there are still "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualification on the commercial sale of arms,"). See also Dotson v. Kander, 464 S.W.3d 190, 198 (Mo. banc 2015) (quoting Heller, 554 U.S. at 626-27, 128 S.Ct, 2783). "First Amendment rights are not absolute under all circumstances. They may be circumscribed when necessary .to further a sufficiently strong public interest.” Greer v. Spock, 424 U.S. 828, 842-43, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (Powell, J„ concurring). "A defendant’s right to present relevant evidence [pursuant to the Sixth Amendment] . is not unlimited, but rather is subject to reasonable restrictions.” United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (footnote' omitted). "Neither the right to refuse treatment nor the right to privacy are absolute....” Cruzan by Cruzan v. Harmon, 760 S.W.2d 408, 419 (Mo. banc 1988). "Although cross-examination is a fundamental component of confrontation, it is not unlimited; limitation of cross-examination does not per se violate a defendant's right to confront the witnesses against him.” State v. Russell, 625 S.W.2d 138, 141 (Mo. banc 1981).

. Though I believe it legally unnecessary, even the majority opinion — perhaps recognizing that it produces a result adverse to the best interest of the state — invites our legislature to entertain the idea of ”chang[ing] section 211.059” to include specific reference to the fact that a Missouri juvenile’s section 211,059 rights are subordinate to the public safety exception as announced in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). If the Missouri Supreme Court fails to take transfer of this case to rectify what I believe to be an erroneous declaration of law by the majority opinion’s ruling today, I join my colleagues in the majority opinion in inviting our legislature to clarify this topic relating to section 211.059.

. In other words, I believe the majority opinion has interpreted section 211.059’s silence on the topic of any remedy to mean that the legislature intended for the exclusionary rule’s application to be interpreted broader than our United States Supreme Court would permit. I am aware of no case in this state, or the country for that matter, that has interpreted a statute to be deemed to have broadened the exclusionary rule’s application (i.e., remedy) via silence on the topic; rather, if the legislature intends such a remedial result, I believe it must say so. Though the majority opinion may desire to infer by implication such additional words of remedy into section 211.059 in this case, appellate courts in this state "will not interpret a statute as a party wishes it were written,” and we "will not add statutory language where it does not exist; this Court merely interprets the statutory language as written by the legislature.” Frye v. Levy, 440 S.W.3d 405, 424 (Mo. banc 2014). "A court may not add words by implication to a statute....” Asbury v. Lombardi, 846 S.W.2d 196, 202 n. 9 (Mo. banc 1993). “[P]ro-visions not plainly written in the law... should not be added by a court under the guise of construction to accomplish an end the court deems beneficial.” Smith v. McAdams, 454 S.W.3d 418, 421 (Mo.App.W.D. 2015) (internal quotation omitted),

.Had the legislature wished to expressly— and without limitation — exclude the usage of statements obtained in violation of section 211.059, it could have done so. For example, in section 211.271.3, the legislature provided that "[ajfter a child is taken into custody ..., all ... statements by the child to the juvenile officer ,.. are not lawful or proper evidence against the child and shall not be used for any *711 purpose whatsoever in any proceeding,- civil or criminal, other than proceedings under this chapter,” But unlike section 211.271.3, the legislature did not impose limits on statements obtained in violation of section 211.059. Thus, any remedy imposed must be judicially crafted. And where our United States Supreme Court has not limited its analysis of the applicability of the exclusionary rule as a judicially crafted remedy to “constitutional rule” cases, see Sanchez-Llamas v. Oregon, 548 U.S. 331, 349-50, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), why'would we?

. The majority opinion cites numerous opinions where Missouri courts have, indeed, judi-dally created the remedy of suppression for violation of juveniles’ rights against self-incrimination (where the statute did not itemize such a remedy); yet, not a single one of those cases involved exigent circumstances emer-gently impacting the public’s safety and welfare. Nor did any of those cases involve unwarned police questions expressly limited to finding a weapon that constituted a continuing and emergent threat to public safety. In - my opinion, this is significant to any analysis evaluating the dual purpose of the exclusionary rule as a judge-made remedy, and as such, the cases cited by the majority opinion are inapposite to the case at hand.

. In Patane, the suspect was questioned absent required Miranda warnings in a non-emergent setting about the location of .40' Glock pistol in his possession. United States v. Patane, 542 F.S., 630, 635, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). The Supreme Court held that even though there was little,practical difference between the suspect’s confessional statement {i.e,, statement as to tire location of the giiti in his home) and the" actual physical evidénce recovered {i.e., the gun that was discovered where the su'spect said it would be), "[introduction of the nontestimo-nial fruit of a voluntary statement, such as respondent's Glock, does- >not implicate the Self-Incrimination Clause',”' and the exclusionary rule was inapplicable to'the recovered weapon. Id. at 643; 124 S.Ct; 2620. Though the present case involves exigent ■ circumstances affecting public safety, and thus, additional factors are present.negating application of the exclusionary rule to J.L.H.’s. statement te Sergeant Williams, the holding in Patane undercuts the majority opinion's suggestion that J.L.H.’s statement (i.e., about the location of the gun) was the only evidence connecting him to possession of the gun. To the contrary, the record reflects that the gun was, not so coincidentally, recovered in exactly the path J.L.H. had taken 'in his flight from officers .who had initially asked him to stop. Therefore, even without J.L.H.’s statement, the recovered gun in the immediate vicinity of J.L.H.’s path of attempted escape from law enforcement was alternatively sufficient to support the juvenile court’s adjudication and disposition ruling. After Patane, thére certainly'is no rational básis for applying the judge-made exclusionary rule to the physical evidence {i.e., gun) that was recovered after J.L.H. was in custody — whether by reference to protections guaranteed by Miranda or section 211.059.

. Limiting the availability of the Quarles exception when dealing with an adult suspect with a youthful appearance would be problematic because "a State may not impose ... greater restrictions as a matter of federal constitutional law when [the Supreme] Court specifically refrains from imposing them.” Oregon v. Hass, 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (footnote omitted).

. Though the Missouri Supreme Court opted not to follow Harling in State v. Arbeiter, 449 S,W.2d 627, 633 (Mo. 1970), it did so because it believed that our statute (§ 211.271.3) provided for a different rule. (Harling required absolute exclusion of juvenile statements in subsequent criminal proceedings, while the Missouri Supreme Court determined in State v. Wright, 515 S.W.2d 421 (Mo. banc 1974), that — under certain circumstances irrelevant here — a juvenile's statement could be used in criminal court.) The Court ultimately agreed with much of the rationale in Harling. Arbeiter, 449 S;W.2d at 633 ("The considerations of ‘fundamental fairness’ alluded to in Harling do not permit the state, in the harsh adversary arena of the criminal courts, to take advantage of the procedures and attitudes which it promotes under the Juvenile Code.”).

. I have located thirtéen other states across the country with statutes codifying Miranda *717 warnings' to juveniles in similár fashion to Missouri: Alábama, Colorado, Connecticut, Indiana, Kansas, Montana, New Hampshire, New York, North Carolina, New Jersey, Texas, Washington, and West Virginia. Of these states, none has interpreted its statute to expand the boundary of the exclusionary rule as a remedy for violation of its juvenile Miranda statute as the majority opinion has done in the instant case. Instead, where exigent circumstances involving public safety were present and a juvenile was questioned without warning as to the whereabouts of the weapon involved, those states have not applied the exclusionary rule to the juvenile’s unwarned statements. See, e.g,, In Re Cy R., 43 A.D.3d 267, 841 N.Y.S.2d 25, 28 (2007); State In Interest of A.S., 227 NJ.Super. 541, 548 A.2d 202, 205-06 (1988) (“Even if [the juvenile] was in custody when he was questioned and when he led the police to the gun, the concern for public safety must be paramount to adherence to the literal language of the prophylactic [Miranda] rules[,]”). And although the State of Iowa does not have a similar juvenile Miranda■ statute, its Supreme Court's commentary on a juvenile’s rights relating to Custodial questioning is apropos when it states that the rights of juveniles “do not exist in a vacuum” and must be balanced with the rights of the public to be protected against exigent threats to the public. In re J.D.F., 553 N.W.2d 585, 588-89 (Iowa 1996). See also Commonwealth v. Dillon D., 448 Mass. 793, 863 N.E.2d 1287 (2007) (holding juvenile's possession of over fifty bullets alone was enough to support the inference that a gun was in close proximity and unwarned statements were permissible because the obligation of protecting other students and the community outweighed juvenile’s rights to be questioned in the presence of juvenile’s parents or other interested adult); In re Roy L., 197 Ariz. 441, 4 P.3d 984 (App.2000) (holding that unwarned questions of a juvenile about a gun in his possession while in a public area near a high school were permissible to protect the public from exigent circumstances affecting the public’s safety).

. The substance of my dissent is a response to the majority opinion’s ruling as to Point I of J.L.H.’s appeal. As the majority opinion ■notes, its ruling as to Point I is dispositive of the result the opinion proposes. As I propose the opposite result. Points II and III are relevant to my discussion of what the result of this case should be.
In Point II, J.L.H. argues that he was arrested without probable cause. I disagree. Because “[a] de facto arrest occurs for Fourth Amendment purposes when the officer’s conduct is more iritrusive than necessáry for an investigative stop,” State v. Wickerham, 28 S.W.3d 401, 403-04 (Mo.App.E.D.2000) (internal citation omitted), I believe the facts of this case are such that a reasonable person in J.L.H.’s position would have understood he was under de facto arrest. And, while a de facto arrest must be based on probable cause, “|p]robable cause exists when the arresting officer is aware of facts and circumstances that are reasonably trustworthy and would lead a person of reasonable caution to believe an offense had been committed.” State v. Pfleiderer, 8 S,W.3d 249, 256 (Mo.App.W.D. 1999). "Probable cause [to arrest] does not mean absolute certainty- Much less evidence is'necessary to establish probable cause than is required to establish guilt....” State v. Tackett, 12 S.W.3d 332, 339 (Mo.App.W.D. 2000) (internal quotation omitted). "While flight alone does not establish probable cause, it can supply the key ingredient- justifying the decision by a law enforcement officer to take action.” State v. Smith, 11 S.W.3d 733, 739 (Mo.App.E.D.1999) (internal quotation omitted). Here, J.L.H.’s de facto arrest was not based solely on his flight from the officers, The officers had an accurate description of a juvenile Wearing certain- distinctive clothing *718 and being armed with a gun. J.L.H. matched that description. When J.L.H. was approached by officers, first he fled, then he failed to stop when instructed to do so, and then he tried to evade officers by ducking behind a car (out of sight), running down a hill, and jumping on a sidewalk along Brush Creek. It was not until an officer drew his weapon and ordered J.L.H. to “Stop" once again that J.L.H. got down on the ground. These circumstances provided probable cause for the officers to effect a de facto arrest of J.L.H.
As to Point III, I note that J.L.H.'s argument is patently illogical and contrary to his own admission — or rather assertion both before the juvenile court and this court — that he was entitled to the protection of section 211,059 — a statute that is only applicable to juveniles. “ ‘A judicial admission is an act done in the course of judicial proceedings that concedes for the purpose of litigation that a certain proposition is true.’ ” Dawson v. Dawson, 366 S.W.3d 107, 115 (Mo.App.W.D. 2012) (quoting Moore Auto. Grp., Inc, v. Goff-stein, 301 S.W.3d 49, 54 (Mo. banc 2009)). “A judicial admission waives or dispenses with the production of evidence and concedes for the purpose of the litigation that a certain proposition is true,” Peace v. Peace, 31 S.W.3d 467, 471 (Mo.App,W.D.2000) (internal ■quotation omitted). Simply put, J.L.H. cannot be heard to argue that he is a juvenile entitled to the statutory protections of section 211.059 that are only afforded to juveniles, but then take the position that the Juvenile Officer has failed to adduce evidence that he is, in fact, a juvenile. J.L.H.’s judicial admission as to his juvenile status concedes for the purpose of this litigation that he is a juvenile.
Thus, I propose to affirm the juvenile court’s adjudication and disposition because all three of J.L.H.’s points on appeal are without merit.